UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

James C.,

      Plaintiff,

v.

Commissioner of Social Security,

      Defendant.

Case No. 18-cv-1687 (ADM/SER)

**REPORT AND RECOMMENDATION**

---

Edward A. Wicklund, Olinsky Law Group, 300 South State Street, Suite 420, Syracuse NY 13202, and Edward C. Olson, Disability Attorneys of Minnesota, 331 Second Avenue, Suite 420, Minneapolis MN 55401 (for Plaintiff); and

Marisa Silverman, Assistant Regional Counsel, Social Security Administration, 1301 Young Street, Suite A702, Dallas TX 75202 (for Defendant).

---

## I. INTRODUCTION

Plaintiff James C. contests Defendant Commissioner of Social Security's denial of his application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–34, and supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1381. The parties filed cross-motions for summary judgment, which were referred to the undersigned for a report and recommendation to the district court, the Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota, under 28 U.S.C. § 636 and D. Minn. LR 7.2 and 72.1. For the reasons set forth below, this Court recommends denying Plaintiff's motion and granting Defendant's motion.

## II. BACKGROUND

### A. Procedural History

Plaintiff filed the instant action for DIB and SSI in January 2015, alleging a disability onset date of December 1, 2013, which was later amended to December 9, 2014. Plaintiff alleges impairments of his back and hip. Plaintiff was found not disabled and that finding was affirmed upon reconsideration. Plaintiff then requested a hearing before an Administrative Law Judge. A hearing was held and, on August 21, 2017, the ALJ issued a decision denying Plaintiff's claim for benefits. Plaintiff sought review of the ALJ's decision through the Appeals Council, which denied review. Plaintiff then sought review in this Court.

### B. The ALJ's Decision

The ALJ found Plaintiff had the severe impairment of severe right hip osteoarthritis with osteophytes, spurring, and loss of joint space. (Tr. 20). The ALJ next concluded that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of a listing in 20 C.F.R. pt. 404, subpt. P, app. 1. (Tr. 21). Specifically, the ALJ analyzed Plaintiff's impairment under Listing 1.02 (major dysfunction of a joint). Tr. 21. The ALJ determined Plaintiff has the residual functioning capacity ("RFC") to

> perform light work . . . except with occasional climbing of ramps and stairs; no climbing of ladders/ropes/scaffolds; occasional balancing, stooping, kneeling, crouching and crawling; frequent use of foot controls on the right; must be allowed to take regularly scheduled breaks every two hours in order to change positions and avoid prolonged standing or sitting; and no exposure to unprotected heights and unprotected moving machine parts.

2

(Tr. 21). The ALJ determined Plaintiff is not capable of performing his past work, but there are jobs in the national economy that he could perform. (Tr. 25–27). Accordingly, Plaintiff was found not disabled from December 9, 2014 through the date of the ALJ's decision. (Tr. 27, 17–18).

### III.   ANALYSIS

#### A.  Legal Standard

Disability benefits are available to individuals determined disabled. 42 U.S.C. §§ 423(a)(1), 1381a; *accord* 20 C.F.R. §§ 404.315, 416.901. An individual is disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also* 20 C.F.R. § 404.1505(a). This standard is met when a severe physical or mental impairment, or impairments, renders the individual unable to do his previous work or "any other kind of substantial gainful work which exists in the national economy" when taking into account his age, education, and work experience. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); *see also* 20 C.F.R. § 404.1505(a). Disability is determined according to a five-step, sequential evaluation process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

> To determine disability, the ALJ follows the familiar five-step process, considering whether: (1) the claimant was employed; (2) she was severely impaired; (3) her impairment was, or was comparable to, a listed impairment; (4) she could perform past relevant work; and if not, (5) whether she could perform any other kind of work.

*Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010) (citing 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)). In general, the burden of proving the existence of disability lies with the claimant. 20 C.F.R. § 404.1512(a); *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991).

If "substantial evidence" supports the findings of the Commissioner, then these findings are conclusive. 42 U.S.C. § 405(g). The Court's review of the Commissioner's final decision is deferential because the decision is reviewed "only to ensure that it is supported by substantial evidence in the record as a whole." *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003). The Court's task is "simply to review the record for legal error and to ensure that the factual findings are supported by substantial evidence." *Id.* This Court must "consider evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Burnside v. Apfel*, 223 F.3d 840, 843 (8th Cir. 2000). A court cannot reweigh the evidence or "reverse the Commissioner's decision merely because substantial evidence would have supported an opposite conclusion or merely because [a court] would have decided the case differently." *Harwood v. Apfel*, 186 F.3d 1039, 1042 (8th Cir. 1999).

### B.  The RFC Finding

Prior to Step Four, the ALJ must assess the claimant's RFC, which is the most a claimant can do despite his limitations. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). It is a "function-by-function assessment of an individual's ability to do work-related activities based upon all of the relevant evidence." *Harris v. Barnhart*, 356 F.3d 926, 929 (8th Cir. 2004). "Medical records, physician observations, and the claimant's subjective statements

4

about his capabilities may be used to support the RFC." *Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012). "Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner." *Cox v. Astrue*, 495 F.3d 614, 619–620 (8th Cir. 2007); 20 C.F.R. § 404.1546(c). The ALJ is tasked with resolving "conflicts among the various treating and examining physicians." *Bentley v. Shalala*, 52 F.3d 784, 785–87 (8th Cir. 1995). While the ALJ retains the authority to determine the RFC and that decision must be supported by some medical evidence, "the burden of persuasion to prove disability and demonstrate RFC remains on the claimant." *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010).

### 1.     The Medical Record and Testimony

Examining the medical record is important to understanding the ALJ's decision and Plaintiff's challenge thereto.

Plaintiff saw chiropractor Mark Garnett on May 14, 2014 for back pain. (Tr. 328–29). Plaintiff complained of pain, reduced range of motion, and altered gait. (Tr. 328). On examination, Plaintiff had antalgic gait and limited flexion and extension. (Tr. 329). Garnett assessed non-allopathic lesions of the lumbar and sacral regions. (Tr. 329). Plaintiff was to ice his low back regularly. (Tr. 329). At a follow-up on May 21, 2014, Plaintiff reported some relief from icing his low back. (Tr. 327). Garnett performed some chiropractic manipulation, which Plaintiff tolerated well. (Tr. 327). Plaintiff reported continued symptoms on May 28 and June 3, 2014, and tolerated Garnett's chiropractic manipulation. (Tr. 325, 326).

Plaintiff saw Dr. Joel Griffin on December 9, 2014. (Tr. 352–54). Plaintiff presented to establish care and discuss chronic knee and back pain ongoing for over one year. (Tr. 352). On examination, Plaintiff had a slow, stiff gait with limp; limited right leg swing; sharp severe pain with hip rotation. (Tr. 353). X-ray imaging showed severe right hip degenerative joint disease with osteophytes, spurring, and loss of joint space. (Tr. 353, 360). Dr. Griffin assessed Plaintiff's back and knee pain to be all or mostly a result of his severe right hip degenerative joint disease. (Tr. 353). Dr. Griffin discussed the "low likelihood of pain medications or physical therapy benefiting [him] with arthritis this severe -- he was scared of prospect of surgery but will consider it." (Tr. 353). Plaintiff wanted a medical opinion form filled out but Dr. Griffin would not do that on Plaintiff's first visit. (Tr. 353). Plaintiff was referred to physical therapy. (Tr. 353–54). Plaintiff was also advised to "[k]eep moving -- it's important!" (Tr. 354).

Plaintiff saw Dr. Griffin again on December 15, 2014. (Tr. 355–56). Plaintiff and Dr. Griffin discussed an orthopedics consult visit; Plaintiff was "very nervous about the idea of surgery -- really doesn't want to consider that at this point." (Tr. 355). Dr. Griffin also discussed x-ray guided steroid injections. (Tr. 355). Plaintiff indicated he would like to start with talking to a surgeon. (Tr. 355). Plaintiff had a medical opinion form for Dr. Griffin to fill out. (Tr. 355; *see* Tr. 346–47).[1] On examination, Plaintiff had a stiff gait

---

[1] Dr. Griffin completed a two-page medical opinion form. (Tr. 346–47). Dr. Griffin indicated Plaintiff was diagnosed with severe right hip arthritis. (Tr. 346). Dr. Griffin opined Plaintiff had employment restrictions of no lifting more than 10 pounds and no standing or walking without a break. (Tr. 346). Dr. Griffin opined Plaintiff could only work 1-10 hours per week and would need frequent breaks to stand or move around. (Tr. 347). Dr. Griffin did not check a box that would indicate his support for Plaintiff's SSI application. (Tr. 347).

with a limp favoring his right hip; he was slow going from sitting to standing. (Tr. 355). Plaintiff was referred for an orthopedics consultation. (Tr. 355).

Plaintiff next saw Dr. Griffin on February 16, 2015. (Tr. 357–58). Plaintiff had not yet completed the orthopedics consultation because he was "scared to do so." (Tr. 357). Nor had Plaintiff gone to physical therapy. (Tr. 357). Plaintiff did, however, request stronger pain medication. (Tr. 357). Plaintiff had another disability application form to fill out. (Tr. 357). On examination Plaintiff had a stiff gait, but Dr. Griffin noted Plaintiff walked out of the office with a mostly non-antalgic gait. (Tr. 357). Dr. Griffin referred Plaintiff again for an orthopedics consultation to discuss treatment options, referred Plaintiff again to physical therapy, and prescribed tramadol for pain. (Tr. 357). As Dr. Griffin noted, he wanted Plaintiff "just to talk" to an orthopedic specialist. (Tr. 358).

Plaintiff was involved in a motor vehicle accident on October 7, 2015. (*See* Tr. 373). Plaintiff did not report to the emergency room until the following day. (Tr. 373). Plaintiff asserted trouble falling asleep, shortness of breath, headache, and pain in his back, neck, right knee, right elbow, right hip, and chest. (Tr. 373–74). Plaintiff reported walking with a limp due to pain. (Tr. 373). After examination and x-ray imaging, the emergency provider's impression was strains and contusions; Plaintiff was to follow-up with this primary care provider in one week. (Tr. 376–77).

Plaintiff saw Dr. Griffin on October 13, 2015 following his emergency room visit after his car accident. (Tr. 441). On examination, Plaintiff had stiff gait, limp favoring the left leg. (Tr. 441). Dr. Griffin recommended Plaintiff keep moving, to "stay loose and active as [he] can." (Tr. 442). Plaintiff had a follow-up with Dr. Griffin on October 27,

7

2015. (Tr. 443). Plaintiff was walking easily but his chronic hip pain was unchanged. (Tr. 443). On examination, Plaintiff had a stiff, slow gait that slightly favored the right side. (Tr. 443). Plaintiff was referred to physical therapy. (Tr. 443).

Plaintiff underwent an initial physical therapy assessment on November 5, 2015 with physical therapist Deborah O'Reilly. (Tr. 385–91). Plaintiff had a "great deal of pain and tightness following [a motor vehicle accident]." (Tr. 385). Plaintiff was unable to "tolerate much evaluation or exercise"; O'Reilly encouraged Plaintiff to move and noted he would benefit from physical therapy to decrease his pain and improve function. (Tr. 385). Plaintiff had "difficulty with all movement throughout [the] appointment." (Tr. 390).

Plaintiff had physical therapy on November 12, 2015, reporting that exercises "kind of lightened the pain a little." (Tr. 393). Plaintiff had a large limp favoring his left leg with minimal left knee movement. (Tr. 393). Plaintiff had therapy on November 19, 2015, with O'Reilly assessing that Plaintiff's gait was "greatly improved today with no limp." (Tr. 395). Plaintiff reported feeling "much less pain following his treatment [that day]." (Tr. 395). Plaintiff was encouraged to do more of his exercises at home and keep moving. (Tr. 395). Plaintiff had physical therapy on December 3, 2015, reporting his pain was "off and on," but that it was a "pretty good day." (Tr. 400). Plaintiff had no limp. (Tr. 400). At physical therapy on December 10, 2015, Plaintiff reported he was doing alright. (Tr. 404). Plaintiff had no limp. (Tr. 404). On December 17, 2015, Plaintiff reported "feel[ing] terrible all over today, not just the injuries." (Tr. 408). Plaintiff had no limp. (Tr. 408).

8

At physical therapy on January 11, 2016, Plaintiff reported missing appointments because his father was hospitalized following a stroke, but that he worked out for 1.5 hours the night prior because he "was not doing well, but felt a lot better following all the exercising." (Tr. 412). Plaintiff had a mild limp. (Tr. 413). On January 20, 2016, Plaintiff reported he has been ok, that his knees are what bothers him, and that the exercises help his pain. (Tr. 417). Plaintiff had a mild limp. (Tr. 418). On January 27, 2016, Plaintiff reported doing a little better, and that he wakes up stiff and sore in the mornings. (Tr. 422). Plaintiff had a mild limp. (Tr. 422). On February 2, 2016, Plaintiff reported his knees were improving but he had a mild limp. (Tr. 427–28). On February 19, 2016, Plaintiff reported doing well; he has pain, but is "able to [do] much more and his pain keeps improving." (Tr. 432). Plaintiff still had a mild limp. (Tr. 432). Plaintiff was discharged from physical therapy on March 25, 2016 as he "did not return." (Tr. 431).

Plaintiff saw Dr. Griffin on November 30, 2016. (Tr. 445). Dr. Griffin wrote:

> he has severe chronic right hip pain, has end-stage arthritis, told h[e] needs a right hip replacement for at least last year. He has chronic pain and weakness in his right knee, all worse since he was in an MVA Oct 2015. He went to physical therapy for his hip, right knee, shoulder which did help but he still has pain. . . . Dull aching pain in his right knee. Somedays he really struggles to get out of bed because of pain, stiffness. In the past he was prescribed Flexeril and tramadol for chronic right hip pain, but he hasn't taken those for many months because they weren't working. He states he can't do the things that he used to do, because of significant pain in his right knee, right shoulder, right hip.

(Tr. 445). On examination, Plaintiff's gait was abnormal, antalgic, slow, and stiff; he walked without a cane or walker. (Tr. 445). Dr. Griffin's assessment was that Plaintiff has clear, significant arthritis. (Tr. 445). Plaintiff was "very reluctant to pursue even the

9

consideration of surgery 'every time I go to the doctor something else bad happens to me.'" (Tr. 445). Dr. Griffin offered an intra-articular steroid injection that Plaintiff was willing to consider. (Tr. 446). Plaintiff was advised to "[g]et into a routine" for his pain, including "[e]xercises, getting out of the house, going to the grocery store, etc." (Tr. 446). Plaintiff was to consider getting a hip injection. (Tr. 446).

At the hearing, Plaintiff, through counsel, indicated the record was complete. (Tr. 35–36). The ALJ asked Plaintiff about being referred to an orthopedist but never having gone. (Tr. 43). Plaintiff testified that he had seen an orthopedist and was told he needed surgery. (Tr. 43). Plaintiff further testified that the orthopedist told Plaintiff he would have to be in a nursing home for two months after surgery, with Plaintiff testifying that he could not do that because he has a child and no source of income. (Tr. 43–44). Plaintiff testified that the physical therapy helped loosen up his hip, but afterwards it returned to the same. (Tr. 45). The ALJ asked Plaintiff what the plan was for his hip, with Plaintiff testifying that he plans on getting surgery but that he has to get "everything in order" beforehand so he will not end up "homeless or financially wrecked." (Tr. 45–46).

### 2. Discussion

The ALJ reviewed the medical record and recounted Plaintiff's testimony that he "needs a total hip replacement." (Tr. 21). The ALJ noted, however, that Plaintiff never saw an orthopedic surgeon and there is "no opinion as to the need for a hip replacement in the record." (Tr. 21). The ALJ further noted that "[w]hile [Plaintiff's] primary care doctor was apparently discussing the prior referral to an orthopedics specialist, this never had occurred, and no doctor had ever recommended surgery." (Tr. 23). The ALJ also

noted that there are no medical records suggesting Plaintiff ever received recommended hip injections as an alternative to surgery. (Tr. 24). The ALJ described Plaintiff's hip treatment as follows: "[T]he course of treatment generally just shows a somewhat stiff gait but with an entirely normal neurological findings, no need for an assistive device for ambulation, and a failure to follow treatment recommendations from the claimant's primary care doctor." (Tr. 24). Ultimately, the ALJ found that the limits claimed by Plaintiff are "entirely out of proportion to the objective findings and minimal amount of treatment received for the right hip condition." (Tr. 21).

Plaintiff asserts the ALJ erred by failing to develop the record prior to making his RFC determination. Plaintiff frames his argument as two discrete components: (1) failure to develop the record with respect to Plaintiff's claim of necessary surgery; and (2) failure to develop the record further by requesting an assessment by an orthopedist. This Court disagrees that these are wholly separate arguments. As the medical record above shows, the arguments are fundamentally intertwined where Plaintiff's orthopedic assessment would have been for the purpose of evaluating the need for surgery.[2] Thus, this Court considers the two arguments together.

Plaintiff's argument suffers from a logical deficiency. Plaintiff asserts the ALJ failed to develop the record by not obtaining an assessment by an orthopedist regarding Plaintiff's capabilities and the need for hip surgery. Plaintiff makes this argument despite previously having been referred to an orthopedist by Dr. Griffin on his first visit on

---

[2] This Court recognizes that Plaintiff also argues an orthopedic assessment is necessary to assess the nature and extent of his hip limitations, but this, too, is intertwined with the need for surgery.

11

December 9, 2014, his second visit on December 15, 2014, his third visit on February 16, 2015, and his final visit on November 30, 2016. The only instances where Dr. Griffin did not refer Plaintiff for an orthopedic consultation were two appointments where the treatment clearly focused on follow-up care after Plaintiff's motor vehicle accident in October 2015. Even then, however, Dr. Griffin continued to recommend physical therapy and increased movement. Thus, it is difficult to find fault in the ALJ not ordering an orthopedic consultation on the need for surgical intervention when Plaintiff rejected every such attempt by his primary care provider for the previous two years. This Court will not permit Plaintiff to frustrate the administrative process by imputing error to the ALJ in failing to develop the record regarding the necessity of hip surgery where Plaintiff himself patently refused to even discuss surgery despite his doctor's continued recommendation.

In the same vein, this Court will not find error as requested by Plaintiff where the ALJ did not order an orthopedic assessment for Plaintiff's limitations, particularly where the record contains sufficient evidence to support the ALJ's RFC determination. While Plaintiff had antalgic gait at many of his medical appointments, the medical record shows Plaintiff's limp improved with physical therapy. It is no surprise, then, that Plaintiff's gains from treatment deteriorated and his antalgic gait returned when he stopped going to physical therapy—as can be seen in Plaintiff's appointment with Dr. Griffin in November 2016 following six months of no physical therapy and his testimony that his condition returned after concluding therapy. An impairment that can be controlled by treatment cannot be considered disabling. *Brown v. Barnhart*, 390 F.3d 535, 540 (8th Cir. 2004).

Moreover, Plaintiff refused to consider most treatment options for his hip ailment. Foremost, Plaintiff never saw an orthopedist to discuss hip surgery despite Dr. Griffin's near-continual recommendation that he do so. A failure to follow a recommended course of treatment, such as a referral to a specialist, weighs against a claimant's credibility. *Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005). Second, Plaintiff did not attend physical therapy as initially referred; instead, he only began physical therapy following his motor vehicle accident, over one year after his first referral. That physical therapy improved his gait problems and pain level. *Brown*, 390 F.3d at 540. Third, Plaintiff never received steroid hip injections despite being offered as an alternative to surgery. Again, failure to follow Dr. Griffin's treatment recommendations weighs against Plaintiff's credibility of disabling impairment. *Guilliams*, 393 F.3d at 802. The ALJ properly discounted Plaintiff's complaints of disabling impairment as inconsistent with his treatment record.

Plaintiff argues that the ALJ improperly discredited his testimony and did not follow SSR 16-3p. SSR 16-3p provides guidance about how an ALJ evaluates statements regarding the intensity, persistence, and limiting effects of symptoms in disability claims. 2017 WL 5180304. Relevant here, the ALJ

> will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints. [The ALJ] may need to . . . ask why he or she has not complied with or sought treatment in a manner consistent with his or her complaints.

13

*Id.* at *9. SSR 16-3p lists various considerations that the ALJ may consider, including inability to afford treatment, but not including a claimant's fear of medical procedures. *Id.* at *10.

Contrary to Plaintiff's argument, the ALJ asked why Plaintiff had not followed-up on surgery and then properly considered Plaintiff's failure to seek treatment consistent with the degree of his complaints. As discussed above, Plaintiff refused to even consider surgical intervention for his hip ailment and never received the hip injections offered as a less-invasive alternative to surgery. Plaintiff's post-hoc argument in his briefing and testimony that he did not pursue surgery because of possible financial implications is contradicted by two years of medical records that indicate the *only* reason Plaintiff would not consider hip surgery was because he feared it. A failure to seek aggressive care, even due to fear, is not suggestive of disabling pain. *Chamberlain v. Shalala*, 47 F.3d 1489, 1495 (8th Cir. 1995); *Brunston v. Shalala*, 945 F. Supp. 198, 201 (W.D. Mo. 1996) ("Plaintiff's refusal to have surgery which could control or improve her condition is a factor which is inconsistent with her complaints of disabling pain. Furthermore, allegations of a disabling impairment may be properly discounted because of inconsistencies such as minimal or conservative medical treatment.") (citations omitted). Moreover, the record contains no evidence whatsoever that Plaintiff ever saw an orthopedist, so the underlying factual basis of his assertion that an orthopedist said he would need two months recovery time in a nursing home is flatly contradicted by the medical record. As such, this Court concludes the ALJ did not err in evaluating Plaintiff's statements and credibility.

In sum, the ALJ did not err in making his RFC determination and it is supported by substantial evidence in the record as a whole. The ALJ did not fail to develop the record with respect to Plaintiff's hip surgery or limitations due to his hip ailment. Rather, the record contains sufficient information to discount Plaintiff's allegations of disabling impairment given his failure to seek the medical care suggested by his primary care provider, his improvement with physical therapy, and the inconsistencies of Plaintiff's statements with the medical record.

## IV.  RECOMMENDATION

Based upon the record, memoranda, and proceedings herein, and for the reasons stated above, **IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Summary Judgment, (ECF No. 16), be **DENIED**, Defendant's Motion for Summary Judgment, (ECF No. 18), be **GRANTED**, and this matter be **DISMISSED**.

Date: June 5, 2019              *s/ Steven E. Rau*
                                Steven E. Rau
                                United States Magistrate Judge
                                District of Minnesota

## NOTICE

**Filings Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).